1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10   ALDO GONZALEZ,                        Case No. 11cv960-DMS (BLM)

11          Petitioner,              **REPORT AND RECOMMENDATION
                                     FOR ORDER DENYING PETITION
12   v.                              FOR WRIT OF HABEAS CORPUS**

13   KATHLEEN ALLISON, Warden,

14          Defendant.

15

16          This Report and Recommendation is submitted to United States District Court Judge

17   Dana M. Sabraw pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of

18   the United States District Court for the Southern District of California.  On May 2, 2011,

19   Petitioner Aldo Gonzalez, a state prisoner who is proceeding pro se and in forma pauperis,

20   commenced these habeas corpus proceedings pursuant to 28. U.S.C. § 2254.  ECF No. 1.

21   ("Pet.").  Petitioner challenges his conviction of first degree murder and personally and

22   intentionally discharging a firearm.  Id. at 2 and ECF No. 7 ("Answer") at 2.  Respondent filed

23   an answer on October 4, 2011 and Petitioner filed a traverse on May 4, 2012.  ECF Nos. 7

24   & 21 ("Traverse").

25          This Court has considered the Petition, Answer, Traverse, and all supporting

26   documents filed by the parties.  For the reasons set forth below, this Court **RECOMMENDS**

27   that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

28                                    1                        11cv960-DMS (BLM)

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in <u>People v. Gonzalez</u>, Appeal No. D052827, slip op. (Cal. Ct. of App. Nov. 17, 2009).  Lodgment 6. This Court presumes the state court's factual determinations to be correct absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003); <u>see</u> <u>also</u> <u>Parke v. Raley</u>, 506 U.S. 20, 35 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

A. People's Case

1. The shooting

Thomas Tweedie belonged to a gang or tagging crew called the "Looney Mob." In addition to putting up graffiti, members of the Looney Mob fought and engaged in violent acts. The Varrio Clairemont gang was a rival of the Looney Mob.

Jordan Ingram hung around with members of the Looney Mob, including Tweedie, but was not a member himself. Near the end of 2004, Ingram was driving his car with two affiliates of the Looney Mob. One of the passengers believed he had spotted a Varrio Clairemont member. They got out of the car and beat him up. Ingram stole his cell phone.

About 25 minutes later, Ingram drove by a car with approximately six people in it. One of the passengers in Ingram's car yelled out, "West Side." Three people got out of the other car and shot at and hit Ingram's car. Ingram drove away. Ingram later told friends belonging to the Looney Mob, including Tweedie, about the incident.

Ingram lived with his mother. Starting about a week prior to May 3, 2005, Tweedie stayed at Ingram's house.

Ernesto Arana, also known as "Flaco", and his brother Marco, also known as "Termite", lived approximately two-tenths of a mile from Ingram's house. They were members of Varrio Clairemont. Ernesto drove a white Ford Ranger truck.

Gonzalez, also known as "Krow," was friends with Ernesto and Marco, and was also a Varrio Clairemont member.

On the afternoon of May 3, 2005, Tweedie, Ingram, and their friends Andrew Shaver and James Rachels, were at Ingram's house. That day Rachels and Shaver had used methamphetamine and smoked marijuana with Tweedie. Shaver had been awake for much of the previous two days.

At approximately 6:00 p.m. that evening, Ricky Martin and Joe Salas rode their bicycles to Ingram's house to look at a car belonging to Ingram's mother. After they arrived they smoked some methamphetamine and marijuana with Ingram. Martin and Salas had been "partying" for a couple of days, and Martin was high that evening. Thereafter, Ingram drove Martin and Salas to a storage unit where Martin had some methamphetamine.

Meanwhile, Tweedie and Rachels were outside Ingram's house talking. A white truck with about three people drove by. Tweedie stated, "There goes Clairemont ... [t]hat's V.C." Rachels turned to look at the street and saw a white truck "creeping, like driving real slow" in front of the house. It came to a complete stop one house down from Ingram's.

Tweedie ran into the house. Shaver saw Tweedie come inside. Tweedie seemed "agitated." He went to the room he shared with Ingram and came back with .22-caliber rifle. He told Shaver that a white truck had driven by with members of Varrio Clairemont in it and he had thrown up the gang sign for West Side, which Varrio Clairemont would take for an insult. Shaver followed Tweedie outside.

By the time they joined Rachels outside, the truck was gone. Rachels saw the gun in Tweedie's hand. Rachels told him the gun was not necessary and that if the people in the truck came back they would fight them. Besides, Rachels had a knife. Tweedie replied that it was more serious than that. The look in Tweedie's eyes suggested he was prepared to use the gun if necessary.

Rachels insisted that Tweedie get rid of the gun. Tweedie set the gun up against the house between some shrubs.

About 15 minutes later, at approximately 9:30 p.m., Ingram, Martin and Salas returned from the storage facility. Tweedie seemed agitated and was looking down the street. He told Ingram he had seen Arana's truck drive slowly by with a couple of Varrio Clairemont members in it about five minutes earlier.

Ingram was scared that the Varrio Clairemont members "had come to finish the job they started when they shot at [his] car...." Tweedie assured him that he didn't need to worry because he had a gun "outside with them." Ingram saw the rifle leaning against the house. Ingram went inside and Rachels followed shortly thereafter.

Shaver saw a group of what appeared to be five men coming down the street. Shaver sensed something was wrong and went inside to tell Rachels.

Martin and Tweedie remained outside chatting. Tweedie was facing the street and Martin was facing Tweedie. Tweedie suddenly seemed to be looking at something fearfully just beyond Martin. Martin saw the group out of the corner of his eye and turned to look at them. There were five or six Latino men moving quickly, purposefully, and in unison. Gonzalez was in front and appeared to be "steering the group." They walked around the rear of Ingram's car and "set up" at the foot of the driveway. Martin thought there was going to be a fist fight and assumed he would have to help Tweedie.

Then Tweedie suddenly yelled, "Oh, fuck," and twisted his body away as if to

"pull something" from behind him or "lift something out from his back." Martin thought he may have been reaching for "a bag of pot." However, on cross-examination, Martin admitted to testifying at the preliminary hearing that when Tweedie twisted, he went to his left and swung something up from his hip, "as if to shoot," and that Tweedie at that time raised "the gun."

Martin saw all the men in the group raise their arms. He saw "the muzzle flash come out" of Gonzalez's arm. Martin saw the bullets strike Tweedie. The shots corresponded to the flashes coming from Gonzalez's arm. Gonzalez was no more than five feet away from Martin when he fired his gun. Martin was looking right at Gonzalez because he was the closest and "most of the fire" was coming from him. Martin testified at trial that he was certain it was Gonzalez that shot Tweedie.

Tweedie fell onto Martin's backpack, which was lying nearby. The group then fled on foot. Martin grabbed his backpack and ran towards the front door screaming, "He's shot. He's shot.... He's dead."

Salas was right behind Martin and was just as scared. He had seen the group of Latinos with shaved heads walk up to the driveway right before he heard a popping sound and saw "gun flash."

During this time, Ingram was inside fixing a bottle for his baby, and Shaver had convinced Rachels to go outside with him because of the group of men he had seen coming down the street. As Rachels and Shaver went out the front door, Shaver heard voices demand in an aggressive way, "What's up." Shaver heard Tweedie respond, "West Side. Looney Mob." The group replied, "Clairemont Trese." Both Rachels and Shaver then heard three gunshots in rapid succession.

Rachels and Shaver ran back into the house. Rachels then crept back outside slowly. At first he could not see anything, but then he saw Tweedie lying face down in the front yard near the sidewalk. Rachels yelled out to Tweedie, but Tweedie only moaned in response. Rachels urged Tweedie to get up, but he was silent. He tried to get closer to Tweedie, but at that moment the police arrived and told him to get on the ground.

Meanwhile, Martin and Salas had grabbed their bikes and left. Martin was frightened of the shooters and did not want to be arrested for the drugs in his backpack. However, they got lost and ended up back at the house. An officer took Martin to the ground, believing he was the shooter because he had blood on him.

Tweedie's friends told police that when they last saw him, Tweedie did not have the rifle in his possession. Officers securing the scene found it on the front lawn near the sidewalk, several feet from Tweedie. The gun's safety was on.

An officer examined Tweedie and he still had a pulse, but his breathing was shallow. He was taken to a hospital, but died shortly thereafter. A blood test showed the presence of methamphetamine and marijuana in his system.

Tweedie was shot three times with a .38-caliber handgun. All three rounds

were fired from the same gun. One bullet pierced his left arm and then travelled [sic] into his left chest. Another went through his upper left chest, crossed two ribs, punctured his aorta and right lung. The third bullet struck him in the lower back, travelled through his ribs then punctured his left lung. Either of the second and third wounds would have been fatal.

Shortly after the shooting a neighbor, Sheri Christman, was walking home from a friend's house with her son, Nicholas, when a group of five young men passed them, walking fast. Christman knew the Arana family, and she thought she recognized Marco Arana's voice when he said, "What's up," as they passed. After they had passed, one said to her son, who was good friends with the youngest Arana son, "Hey, Nick."

Gustavo Arana, the father of the Arana brothers, had a white Ford Ranger pickup. It belonged to a friend, but Mr. Arana was allowed to use it at will, and he allowed his sons to use it regularly. The truck was at his house the day of the shooting and his family had access to it.

Cynthia Arana, the Arana brothers' mother, testified Gonzalez was at her house that night and left with them to go to the store about an hour before the shooting. She insisted they were gone for only 10 minutes. Although at first she insisted they did not drive, she eventually admitted that the closest store was 10 minutes away by foot and they could not have gone by foot or bicycle. She admitted that the truck keys were available in the kitchen and she was not guarding them the whole time.

Cynthia Arana claimed Gonzalez and her sons returned home from the store before the shooting and were within her sight when the shots were fired. She said they came in the house afterward and were not at all excited. When the prosecutor confronted her with her statement to the police that they came running into the house excitedly after the shooting, she admitted that they ran in, but only to ask her if she heard the shots. She denied telling the police that they were excited.

2. Rosa Gonzalez

At approximately 7:00 a.m. the morning after the shooting, Rosa, Gonzalez's younger sister, was crying and "very sad" at school. Lori Schuman, a teacher's aide, asked Rosa what was wrong. Rosa asked Schuman if she had heard about the shooting the night before. Schuman replied that she had heard it on the news. Rosa told her, "It was my brother." Rosa said her family was "talking about needing to hide [Gonzalez]." Rosa also named two Arana brothers by their gang monikers as being involved. Schuman cautioned Rosa not to talk to anyone about the matter and walked her to class.

On the way, Rosa showed Schuman a letter she had written to her friend, Ana, about the shooting. The letter read as follows:

"Hey, wud up, Flaka. How you been? I hope good. I've been in a bad mood since yesterday cuz of what happened. Man, that shit is fucken stupid. Okay, this is how it all happened.... [¶] A few months ago my brother had beat up Tommy [from] BR (Brown Ridaz) & none of them did nothing about it (the Brown Ridaz) but on Tuesday at 9:30 p.m. my

brother Krow, Flako, Termite, Solo, and Pwee were cruising and they saw Tommy, all of the CLMT fools had guns at that time. [¶] So Tommy had said that he was gonna kill Krow & PWee. So my brother rolled da window down and I guess ... el Krow and Flako shot him cuz ... the 1st time they shot him the 2nd time they ... my bother shot him in his chest, Flako then shot him another time making sure he was dead. That's what happened Tuesday."

As discussed above, "Krow" was Gonzalez's gang moniker, "Flaco" was Ernesto Arana's, and "Termite" was Marco Arana's. "PWee" was Gonzalez's younger brother, and "Solo" was another Arana brother.

The letter also described a subsequent encounter with members of the "Brown Riders," a rival gang to Varrio Clairemont, who went to Gonzalez's house to retaliate shortly after the shooting. Rosa bragged that she challenged and intimidated one of the gang's female members. The letter ended with Rosa asking Ana not to repeat its contents to anyone.

Rosa gave the letter to Ana, who gave it to a boy she knew, Jonathon Mendoza, who was in a rival gang to Varrio Clairemont that was friendly with the Looney Mob. Within a few days, police had the letter. When Rosa found out, she told Schuman that she regretted writing the letter and that Gonzalez was upset with her for doing so. Later, when Gonzalez was arrested, Rosa cried and told Schuman she felt responsible for his arrest. She stated she would try to help her brother by denying she wrote the letter.

3. Police investigation

Police searched Gonzalez's room. It was covered with Varrio Clairemont graffiti, including Gonzalez's gang moniker, Krow. The phrase "Varrio Clairemont Trese" was written on his door. Police did not find any guns, ammunition, or gunshot residue. Police also impounded the white Ford Ranger pickup. They found fingerprints belonging to Marco Arana on the rearview mirror, but no prints matching those of Gonzalez.

Five days after the shooting, San Diego Homicide Detectives Jana Beard and Anthony Johnson went to Rosa's school to interview her. Rosa seemed curious and a bit nervous, but not frightened or intimidated. She appeared willing to be interviewed and was "very congenial" during the interview.

Initially, Rosa told detectives she " 'd[id]n't know anything." But when police confronted her with her letter, she became more forthcoming. Rosa said that on the night of the shooting, Gonzalez came home late and "acting aggressive." He knocked on the door and yelled to be let in. When he got inside, he acted "really, really, weird." He acted excited, but also scared. He said he and Ernesto Arana "shot the guy." He told her the shooting was payback for a previous fight.

Rosa said she wrote the letter to Ana the following day. She said the letter was her understanding of what happened, but admitted to embellishing it to make it sound more dramatic.

Rosa was also interviewed by the detectives at the police station. Rosa told

6

police that when Gonzalez came home the night of the shooting, she heard him talking on the phone. Gonzalez was excited and said, "Hey dude guess what happened!" and "[O]h yeah we shot this guy ..." [and] "me and Flaco had a gun...." Yeah we saw the one dude last night and we shot him and I don't know what happened to him. If he is dead or something...." She heard him on another call talking about confronting the victim and saying, "[F]uck BR." The person responded, "[F]uck Clairemont," so they shot him. Gonzalez did not mention anything about the victim having a gun. She also heard him bragging about the shooting a few days later with Ernesto Arana. Ernesto said to Gonzalez, "[D]o you remember when I passed the gun to you and you shot and just left." Rosa also told the police that Gonzalez went to his godmother's house the day after the shooting and "holed up" there, refusing to venture outside for any reason.

Gonzalez was brought in to be interviewed while Rosa was still at the station. Gonzalez denied any involvement in the shooting. He also denied being a member of Varrio Clairemont, although he admitted he used to claim membership in the gang. He claimed not to know the Arana brothers' gang monikers, but then understood and responded to questions using those monikers.

Midway through the interview, the detectives left the room and allowed Rosa to go inside with her brother. Gonzalez immediately told her not to say anything "because [of] the camera...." He tried to direct her to say the letter was not hers. He then told Rosa, "If they ask you something else, you don't know anything. Do you understand?"

Detective Johnson reentered the room and, after sending Rosa outside to her parents, resumed the interview. Gonzalez admitted he was with Ernesto and Marco Arana the night of the shooting. At first he said that he was at their house all night and never left, but when confronted with other witness's statements he had left in a white truck that evening, Gonzalez replied that he was "too damn high" to remember what happened. Gonzalez said he and the Arana brothers were hanging out in front of their house when they heard a noise like firecrackers and they went inside. They remained there until they left for a friend's house at midnight, after which he got home about 1:30 a.m.

Detective Johnson told Gonzalez that police had found a rifle on the ground at the crime scene and then told Gonzalez that "if a guy pulled a gun and that's what happened, then it's self defense, but you need to tell me that, because I can't speculate...." Gonzalez insisted he was not involved in the shooting and did not even know about it until he saw it the next day on the news. Detective Johnson asked him again, "At any time on Tuesday, May third, in the evening did you ever feel like your life was in danger or like you had to defend yourself, for the record?" Gonzalez replied, "No."

4. Gang evidence

District Attorney Investigator Joseph Winney testified that the graffiti found in Gonzalez's room was unique to members of the Varrio Clairemont gang and indicated that the person living in the room was a member. Moreover, he had met Gonzalez less than a month before the shooting when conducting a probation search of Marco Arana. At the time, Gonzalez identified himself as

a Varrio Clairemont gang member.

Investigator Winney testified concerning gang structure, colors or articles of clothing used to identify gangs, gang rivalries, and gang members' motivation to commit crimes to increase their status within gangs.

Investigator Winney testified that if a person were to call out a West Side slogan or make that gang's sign to a Varrio Clairemont member, it would anger and provoke the Varrio Clairemont member into retaliating. He said it would be typical for the gang member to round up other members and return to punish the offender when that person was alone or otherwise vulnerable, and it would not be unusual for the confrontation to end in a shooting death.

5. Martin's lack of cooperation/fears of retaliation

Martin initially refused to cooperate with police, angry with them about his treatment after the shooting and his belief they had stole money and property from his backpack. He was also fearful of getting involved because he did not want to invite retaliation. He testified that when police asked him to look at photographic lineups, he pretended not to recognize anyone, even though he recognized Gonzalez as the shooter.

Months later, Martin changed his mind and decided to cooperate with police. He had been living on the streets of Clairemont and felt threatened. He asked for witness protection in exchange for his cooperation. At trial, he was still so frightened of retaliation that he initially refused to tell defense counsel the location of his drug rehabilitation program.

When defense counsel asked Martin if he testified in exchange for a promise to "hook [you] up," Martin responded, "That's a bald face lie." He pointed out that the defense investigator offered him "a better deal" than the district attorney's office, including housing and a stipend, to try to "sway him in favor of [the defense]," but he refused.

An investigator testified Martin was relocated to a remote part of the county under the state's witness protection program and that the fund, which was separate from the district attorney's office, paid most of Martin's expenses directly so that Martin himself received only minimal amounts of cash. The last payment on Martin's behalf ended roughly a year before trial.

B. Defense Case

Toxicologist Darrell Clardy testified about the effects of methamphetamine on the body. Use of the drug, especially when accompanied by little sleep, impacts a person's ability to perceive an event. It can cause a person to see or hear things that did not actually happen, to confuse things, or to focus on certain things and nothing else. That person may have trouble processing and accessing the memory of the event and may include things that did not happen when recalling it, even if not under the influence at the time of recall. A chronic methamphetamine user under the influence of the drug would likely act irrationally, confused, or disoriented, and have a tendency toward violence and exhibit psychotic or paranoid behavior.

Gonzalez also called his father, Luciano, who testified he heard about the shooting on the news. Gonzalez was not home at the time, arriving at approximately 1:00 a.m. He did not seem upset or act unusually the next day. It did not trouble his father "at all" that his son's room was covered with gang graffiti. He believed Gonzalez was honest.

Gonzalez's mother and father did not have a landline at their house, and Gonzalez did not have a cell phone. His father and brother Jose had cell phones at the time, but Gonzalez would not typically use them. Jose testified that Gonzalez did not use his cell phone on May 3, 2005, or on the following days.

Defense investigator Michael Reyes spoke with Martin while he was in jail two times during the middle of 2006. Martin told him the district attorney's office "would help him set up for about two or three months to make a comfortable living after this whole case was finished." Reyes testified he thought it was "obvious" the district attorney's office was paying Martin's way in exchange for "winning the case with the DA." He admitted, however, that he did not actually ask why Martin was being housed out of town at government expense. He did not record his conversation with Martin. He denied offering Martin anything in exchange for his cooperation.

Brian Gilbert, an individual who was not a licensed investigator, but "work[ed] for" one, testified he interviewed Kelly Martinez three days before trial. He testified that Shaver came to her house the day after the shooting and told her that he and Ingram "tried to get the gun off [Tweedie] after [Tweedie] was shot to put the lock back on." Like Reyes, he did not record his conversation with Martinez. He also admitted that when he interviewed Martinez a year earlier, she did not mention this event, her sudden recollection of the event seemed odd, and he should have followed up on it but did not.

Martinez disagreed with Gilbert's testimony. She said that Shaver and Ingram had come to her house and talked about the shooting, but she could not recall the conversation in detail. When asked if she had recently told Gilbert that Shaver said they tried to take the rifles off of Tweedie's body and engage the safety, she said, "No, I don't think I said that." Shaver also denied he said that to Martinez or handled the rifle after the shooting.

Lodgment 6 at 2-16.

In December 2007, the People of the State of California filed an amended information charging Petitioner with murder. Lodgment 1 at 5. Following a trial, the jury found Petitioner guilty of first degree murder. Id. at 463. The jury also found true allegations that Petitioner intentionally and personally discharged a firearm and proximately caused great bodily injury or death to a person within the meaning of Penal Code section 12022.53(d) and that Petitioner personally used a firearm within the meaning of Penal Code section 12022.5(a). Id. at 5, 463 & 553. On March 20, 2008, the trial judge sentenced Petitioner

1  to an indeterminate term of fifty years to life.  Id. at 555.

2      Petitioner appealed his conviction, arguing that (1) there was insufficient evidence to

3  sustain his first degree murder conviction, (2) the trial court committed prejudicial error and

4  violated his rights to due process and to present a defense by refusing to instruct the jury

5  on imperfect self-defense, and (3) the trial court committed prejudicial error and violated his

6  right to a fair trial by allowing the prosecution to introduce prejudicial gang evidence against

7  him.  Lodgment 3.  On November 17, 2009, the court of appeal published a written opinion

8  affirming the judgment of the trial court.  Lodgment 6.

9      Petitioner filed a petition for rehearing in the court of appeal on December 1, 2009,

10  which was summarily denied on December 7, 2009.  Lodgments 7 & 8.  On December 24,

11  2009, Petitioner filed a Petition for Review in the California Supreme Court reasserting the

12  same three claims.  Lodgment 9.  On February 3, 2010, the California Supreme Court

13  summarily denied the petition for review without citation or authority.  Lodgment 10.

14                              **SCOPE OF REVIEW**

15      Title 28, United States Code, § 2254(a), sets forth the following scope of review for

16  federal habeas corpus claims:

17      The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
        entertain an application for a writ of habeas corpus in behalf of a person in
18      custody pursuant to the judgment of a State court only on the ground that he
        is in custody in violation of the Constitution or laws or treaties of the United
19      States.

20  28 U.S.C. § 2254(a) (West 2012).

21      The Petition was filed after enactment of the Anti-terrorism and Effective Death

22  Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C.

23  § 2254(d), as amended by AEDPA:

24          (d) An application for a writ of habeas corpus on behalf of a person in
        custody pursuant to the judgment of a State court shall not be granted with
25      respect to any claim that was adjudicated on the merits in State court
        proceedings unless the adjudication of the claim—
26
27          (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law, as determined by

28                                  10                    11cv960-DMS (BLM)

1 the Supreme Court of the United States; or

2  (2) resulted in a decision that was based on an unreasonable
3 determination of the facts in light of the evidence presented in the State court
proceeding.

4 28 U.S.C. § 2254(d) (West 2012).  In making this determination, a court may consider a

5 lower court's analysis.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991) (authorizing a

6 reviewing court to look through to the last reasoned state court decision).  Summary denials

7 are presumed to constitute adjudications on the merits unless "there is reason to think some

8 other explanation for the state court's decision is more likely."  <u>Harrington v. Richter</u>, 131

9 S.Ct. 770, 784-785 (2011).

10  A state court's decision is "contrary to" clearly established federal law if the state

11 court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court]

12 cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision

13 of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court]

14 precedent."  <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000).

15  A state court's decision is an "unreasonable application" of clearly established federal

16 law where the state court "'identifies the correct governing legal principle from [the

17 Supreme] Court's decisions but unreasonably applies that principle to the facts of the

18 prisoner's case.'"  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (quoting <u>Williams</u>, 529 U.S.

19 at 413).  "[A] federal habeas court may not issue [a] writ simply because that court

20 concludes in its independent judgment that the relevant state-court decision applied clearly

21 established federal law erroneously or incorrectly.  Rather, that application must be

22 objectively unreasonable."  <u>Id</u>. at 75-76 (emphasis added) (citations and internal quotation

23 marks omitted).  Clearly established federal law "refers to the holdings, as opposed to the

24 dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."

25 <u>Williams</u>, 529 U.S. at 412.

26  If the state court provided no explanation of its reasoning, "a habeas court must

27 determine what arguments or theories supported or . . . could have supported, the state

28

11

court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Harrington, 131 S.Ct. at 786.  In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent.

Finally, habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2) (1996); Wood v. Allen, 130 S.Ct. 841, 845 (2010).  A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court.  See Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable).  This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473-474 (2007).

## DISCUSSION

Petitioner raises three grounds for relief in his Petition.  First, he contends that "since the evidence at trial raised a 50% or less probability that [Petitioner] and not some one [sic] else shot the victim," there was insufficient evidence to support his murder conviction.  Pet. at 6.  Next, Petitioner alleges that his right to Due Process was violated by the trial court's refusal to instruct the jury on imperfect self-defense.  Id. at 7.  Finally, Petitioner contends that his right to Due Process and a fair trial was violated when the trial court admitted unduly prejudicial testimony from a gang expert regarding criminal street gangs.  Id. at 8. Respondent contends that Petitioner is not entitled to relief because the state court's determination of Petitioner's case was objectively reasonable.  Answer.

## A.    Sufficiency Of The Evidence

Petitioner argues that there was insufficient evidence to support his conviction.  Pet. at 6.  Petitioner states that the prosecution failed to pursue a theory of aiding and abetting and instead only focused on their theory that Petitioner fired the three bullets that killed the victim.  Id.  Additionally, Petitioner argues that the evidence presented by the prosecution "at best established that [Petitioner] was one of two or more possible shooters."  Id.  Finally, Petitioner notes that he is "appealing the fact that there was no physical evidence, no gun powder residue, nothing ever tying petitioner to the case."  Traverse at 5.

Respondent contends that Petitioner's claim lacks merit because the state court's determination of the matter was objectively reasonable and "was neither contrary to, nor an unreasonable application of, clearly established federal law."  Answer at 18-20.

Petitioner presented his first claim to the state supreme court in a petition for review. Lodgment 9.  The petition for review was summarily denied without a statement of reasoning or citation of authority.  Lodgment 10.  Petitioner presented this claim to the appellate court in the same manner as it was presented to the state supreme court.  Lodgment 3 at 26.  The appellate court denied the claim in a reasoned opinion.  Lodgment 6.  The Court will therefore look through the silent denial by the state supreme court to the appellate court opinion.  Ylst, 501 U.S. at 804.  The appellate court stated:

A. Standard of Review

> The critical inquiry on review of the sufficiency of the evidence is whether the record reasonably supports a finding of guilt beyond a reasonable doubt. "[T]his inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ( Jackson v. Virginia (1979) 443 U.S. 307, 318-319, 99 S.Ct. 2781, 61 L.Ed.2d 560; People v. Johnson (1980) 26 Cal.3d 557, 576, 162 Cal.Rptr. 431, 606 P.2d 738.) Thus, " ' "[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ( People v. Bean (1988) 46 Cal.3d 919, 933, 251 Cal.Rptr. 467, 760 P.2d 996; People v. Stanley (1995) 10 Cal.4th 764, 793, 42 Cal.Rptr.2d 543, 897 P.2d 481.) A reviewing court must

accord deference to the jury and not substitute its evaluation of a witness's credibility for that of the fact finder. ( People v. Ochoa (1993) 6 Cal.4th 1199, 1206, 26 Cal.Rptr.2d 23, 864 P.2d 103.)

B. Analysis

Section 189 provides in relevant part, "All murder which is perpetrated by means of ... willful, deliberate, and premeditated killing ... is murder of the first degree." Personal discharge of a firearm requires that the defendant himself intended to and did discharge a firearm, causing a death. (§ 12022.53, subd. (d).)

Gonzalez asserts that the evidence is insufficient to show he was the shooter. However, while attacking the credibility of Martin and Rosa, Gonzalez ignores the substantial evidence pointing to him as the shooter. Martin, an eyewitness to the shooting, identified Gonzalez as the shooter. Rosa wrote in a letter, and told a teacher's aide, that Gonzalez shot Tweedie. She later admitted to police that Gonzalez told her he had shot Tweedie, and she overheard him bragging about the shooting. Further, the forensic evidence of the three gunshot wounds to Tweedie, fired from one gun, supported Martin's claim Gonzalez was the shooter. Circumstantial evidence of Gonzalez's own actions following the shooting, including his fleeing to his godmother's house and hiding there for a week, were evidence of a consciousness of guilt. Gonzalez's inconsistent and false statements to police, were also probative of his guilt. Finally, Gonzalez's status as a member of Varrio Clairemont, and the fact one of the Looney Mob had beat up one of his fellow gang members earlier, supplied a motive for the shooting.

Gonzalez cites the "grave credibility problems" with Martin's testimony, including the fact he was high on methamphetamine and failed to pick out Gonzalez from a police lineup. He also argues the inaccuracies in Rosa's letter as to how the shooting occurred and the fact she later changed her story when she talked to police rendered her testimony "unreliable."

However, the weight and credibility of Martin's and Rosa's testimony were matters for the jury to decide, which we may not reweigh on appeal: "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." ( People v. Young (2005) 34 Cal.4th 1149, 1181, 24 Cal.Rptr.3d 112, 105 P.3d 487.)

The jury in this matter heard the testimony of Martin and the evidence of Rosa's statements, as well as the other witnesses and evidence admitted at trial. To the extent there were weaknesses or inconsistencies in the evidence at trial, the jury resolved these doubts against Gonzalez. We may not question their credibility determinations and conclusion that Gonzalez was the shooter. Thus, substantial evidence supports his conviction for first degree murder and the allegation that he personally used a firearm in committing that crime.

Lodgment 6 at 16-18.

The clearly established federal law regarding sufficiency of the evidence claims in the criminal context is set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  Jackson claims face a high bar in federal habeas proceedings.  Coleman v. Johnson, --- S.Ct. ----, 2012 WL 1912196, *1 (U.S. 2012).  In Jackson, the Court held that the Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."    Jackson, 443 U.S. at 324.  In making this determination, habeas courts must respect "the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." United States v. Cordova Barajas, 360 F.3d 1037, 1041 (9th Cir. 2004) (citing United States v. Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir.1992)).  "Although it might have been possible to draw a different inference from the evidence, [a federal habeas court is] required to resolve that conflict in favor of the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1114-15 (9th Cir. 2011); see also Coleman, --- S.Ct. ----, 2012 WL 1912196 at *1 (stating that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'") (quoting Cavazos v. Smith, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam)); and Jackson, 443 U.S. at 326, 99 S.Ct. 2781 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").  Federal habeas courts also must analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir.

2004) (en banc) (quoting Jackson, 443 U.S. at 324 n.16).  When assessing the evidence presented at trial, a reviewing court must conduct a thorough review of the state court record.  Jones v. Wood, 114 F.3d 1002, 1013 (9th Cir. 1997).

The Ninth Circuit has made clear that "[a]n additional layer of deference is added to this standard by 28 U.S.C. § 2254(d), which obliges [Petitioner] to demonstrate that the state court's adjudication entailed an unreasonable application of the quoted Jackson standard." Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir. 2009) (citing Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)). In Allen, the Ninth Circuit first reviewed the standard of review applied by the state appellate court to a sufficiency of the evidence claim, and found that although the state court did not cite to the relevant federal case law, "such a citation is not required 'so long as neither the reasoning nor the result of the state-court decision contradicts' Supreme Court precedent." Id. at 1274 n.12, quoting Early v. Packer, 537 U.S. 3, 8 (2003).  Accordingly, it falls to this Court to determine whether the state appellate court opinion here "reflected an unreasonable application of Jackson . . . to the facts of this case." Juan H., 408 F.3d at 1275.

As an initial matter, it is clear from the appellate court's citation to the case, that the state court applied the Jackson standard in reviewing Petitioner's sufficiency of the evidence claim. Lodgment 6 at 16. The question, then, is whether it did so reasonably.  See Briceno, 555 F. 3d at 1078; Juan H., 408 F. 3d at 1274.

As the appellate court correctly stated, under California law, a person is guilty of committing murder in the first degree when she or he commits murder[1] "which is perpetrated by means of . . . willful, deliberate, and premeditated killing."  Lodgment 6 at 17 (quoting Cal. Penal Code § 189). In this case, Petitioner does not contest the sufficiency of the evidence with respect to any particular element of the crime. ECF. No. 1 at 6.  Rather,

---

[1]Murder is defined as "the unlawful killing of a human being, or a fetus, with malice aforethought." Cal. Penal Code § 187.

1   Petitioner challenges the validity of the verdict because there was no physical evidence

2   linking him to the crime and the evidence presented, "at best established that he was one

3   of two or more possible shooters." Id. & Traverse at 5.  Petitioner argues that the testimony

4   of one witness was not sufficient to support his conviction and notes that there were serious

5   concerns about the credibility of that witness.  Id. & Traverse at 5.  Petitioner further argues

6   that the prosecution should have pursued a theory of aiding and abetting instead of focusing

7   only on their theory that he fired all three bullets that killed the victim.  ECF No. 1 at 6.

8           While Petitioner correctly states that there was no physical evidence such as gun

9   powder residue or the murder weapon (Lodgment 2 at 363, 1497 & 1594), the Constitution

10  does not require such evidence.  See Jackson, 442 U.S. at 324-25 and Schad v. Ryan, 671

11  F.3d 708, 717 (9th Cir. 2011) (stating that "[c]ircumstantial evidence and reasonable

12  inferences drawn from it may properly form the basis of a conviction.").  Here, there was

13  substantial evidence, both direct and circumstantial, supporting the verdict.  For example,

14  Ricky Martin identified Petitioner as the individual who shot and killed the victim and stated

15  that he saw the "muzzle flash" come out from the end of Petitioner's arm.  Lodgment 2 at

16  390-404.  Petitioner's sister, Rosa Gonzalez also identified Petitioner as being involved in the

17  murder.  In a letter to a friend, Rosa wrote that Petitioner and his friends killed the victim

18  in retaliation for the victim stating that he was going to kill Petitioner and Petitioner's brother.

19  Lodgment 2 at 1020-1023.  Rosa wrote that Petitioner fired one of the shots.  Id.  While

20  Rosa testified during the trial that she did not write the letter and that the contents of the

21  letter were not accurate (id. at 1064-1068, 1110, 1118-1119, 1181, 1189), the jury was free

22  to disregard Rosa's testimony and credit the contents of the letter.  Walters, 45 F.3d at 1358.

23  The forensic evidence showed that the three bullets that killed the victim were shot from the

24  same 38 special or 357 hand-gun, which supports Martin's testimony that it looked like the

25  shots that hit the victim were all fired by Petitioner and Mr. Shaver's testimony that he heard

26  three quick shots before the victim was killed.  Lodgment 2 at 362, 404 & 805.  Additionally,

27  the jury was presented with testimony and evidence demonstrating that Petitioner was a

28

member of a gang (Varrio Clairemont) that had been insulted when the victim (a member of the rival Looney Mob tagging crew) threw up a rival gang sign and that had recently had one of its other members assaulted by members of Looney Mob. Id. at 147-148, 162, 206, 1110, 1181, 1334, & 1371-1372. An expert witness on criminal gangs testified that after an attack or a real or perceived act of disrespect, aggrieved gang members frequently will retaliate against the member of a rival gang and that the retaliation usually involves violence, such as firing weapons. Id. at 1326-1397. This evidence provided the jury with a possible motive for Petitioner to kill the victim. Finally, the prosecution also presented evidence showing that following the shooting, Petitioner left his home and spent a week hiding out at his godmother's house and provided false and inconsistent statements to the police. Id. at 1248, 2121. This evidence was more than sufficient for a rational trier of fact to conclude that Petitioner was guilty as charged.

While labeled a challenge to the sufficiency of the evidence, Petitioner is really challenging the jury's credibility determinations. Petitioner argues that Martin was not credible and without his testimony, there was insufficient evidence to support Petitioner's conviction. Pet. at 6. As set forth above and in the state court's opinion, there was substantial evidence in addition to Martin's testimony that supported Petitioner's conviction. Lodgment 6 at 17-18. Moreover, while there was evidence challenging Martin's credibility (see, e.g., Lodgment 2. at 425-437), there also was evidence corroborating it (see, e.g., Lodgment 2 at 362 & 803-805). As previously stated, this Court must respect "the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." Walters, 45 F.3d at 1358. As such, Petitioner's challenge to the jury's apparent credibility determinations fails.

Finally, there is no legal or factual merit to Petitioner's argument that the government should have pursued an aiding and abetting theory or that there was only one unreliable witness supporting the verdict. As summarized above, there was substantial evidence

1  supporting the verdict.  And, even if there was only a single witness, the Constitution does

2  not prohibit a verdict based upon such evidence.  See e.g. Jones v. Wood, 207 F.3d 557, 563

3  (9th Cir. 2000) (finding sufficient evidence to support a murder conviction where the

4  evidence was almost entirely circumstantial and relatively weak).

5      There was substantial evidence to support Petitioner's conviction for first degree

6  murder and Petitioner has not established that "no rational trier of fact could have found

7  proof beyond a reasonable doubt."  Jackson, 443 U.S. at 324.  Accordingly, the state court's

8  analysis and decision denying the sufficiency of evidence claim was not "contrary to or an

9  unreasonable application of Federal law."  28 U.S.C. § 2254(d)(1).  For these reasons, this

10 Court finds Petitioner's sufficiency of the evidence claim to be without merit and

11 **RECOMMENDS** that Petitioner's Petition be **DENIED** on ground one.

12 **B.    Imperfect Self-Defense Jury Instruction**

13     Petitioner argues that "the trial court erroneously refused to instruct on imperfect

14 self-defense in violation of [his] constitutional rights to due process and to present a

15 defense."  Pet. at 7.  In support, Petitioner states that despite evidence indicating that the

16 victim claimed his gang affiliation and raised up a rifle as if to shoot it before he was shot,

17 the court only instructed the jury regarding perfect self-defense.  Id.  According to Petitioner,

18 the jury should have also received an instruction regarding imperfect self-defense[2] and the

19 failure to do so "made it impossible for the jury to accurately evaluate [his] culpability for the

20 shooting incident."  Id.  Petitioner further claims that the court's failure to give the instruction

21 precluded the jury from considering his defense which is critical to a fair trial.  Traverse at

22 6.

23     Respondent contends that the trial court's determination of the matter was objectively

24 reasonable.  Answer at 20.  Respondent further contends that in order to receive habeas

25 _____

26   [2]Under the imperfect self-defense doctrine, if a defendant subjectively believed it was necessary to use deadly force in self-defense, but was objectively unreasonable in doing so, then the defendant lacked the

27 requisite element of malice necessary for a conviction of murder, and thus can be convicted only of voluntary manslaughter.  See Menendez v. Terhune, 422 F.3d 1012, 1028 (9th Cir.2005).

28                              19                          11cv960-DMS (BLM)

relief, Petitioner was required to show that omitting the jury instruction for imperfect self

defense "so infected the entire trial that the resulting conviction violated his federal

constitutional right to due process," which he failed to do. Id. at 22. Respondent notes that

there was insufficient evidence to support a defense of imperfect self-defense and that

Petitioner "did not rely on self-defense, imperfect or otherwise, as his primary defense at

trial." Id.

The state trial court discussed the issue of jury instructions with counsel and

presented both sides with an opportunity to voice their position as to whether or not the

imperfect self-defense jury instruction was warranted. As the appellate court summarized,

> [a]fter both sides rested, jury instructions were discussed. The court agreed to instruct the jury on self defense, whereupon defense counsel stated, "I think the imperfect self-defense applies." The court responded, "Tell me how? [B]ecause there has to be some evidence to support the instruction." Defense counsel argued that Tweedie was high on a drug that can cause aggression and was talking "about blowing somebody down." He also argued that Tweedie "went to his left, pulling something up as if to draw a weapon," although Martin denied that occurred when he testified.

> The court stated that, given the state of the evidence, the only way to justify an imperfect self-defense instruction would be for Gonzalez "to testify and say that he was acting in self-defense, which we don't have, and the facts [don't] support it." The court stated that imperfect self-defense "requires an actual, but unreasonable, belief [in] the necessity to defend oneself." The court opined that absent Gonzalez testifying to an "actual ... belief" in the need to defend himself, it was "pure speculation" that he felt such a need.

> The court ruled imperfect self-defense was not applicable, but invited defense counsel to provide authority supporting his position at the next court session. When discussion of jury instructions resumed the next day, defense counsel made no further argument on imperfect self-defense and did not submit any authority to the court.

Lodgment 6 at 19. The trial court did instruct the jury on murder in the second degree,

voluntary and involuntary manslaughter, and self-defense. Lodgment 2 at 2071-2083.

Petitioner raised this claim in the petition for review he filed in the California Supreme

Court, which denied the petition without citation of authority. Lodgment 10. Accordingly,

this Court must "look through" to the state appellate court's opinion denying the claim as the

basis for its analysis. Ylst, 501 U.S. at 801-06. That court analyzed the claim as follows:

B. Analysis

In a criminal case, the trial court has a sua sponte duty to instruct " 'on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations.] Included within this duty is the ' ... obligation to instruct on defenses, ... and on the relationship of these defenses to the elements of the charged offense ... ' where ' ... it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense....' [Citation.]" ( People v. Stewart (1976) 16 Cal.3d 133, 140, 127 Cal.Rptr. 117, 544 P.2d 1317.)

In People v. Humphrey (1996) 13 Cal.4th 1073, 1082, 56 Cal.Rptr.2d 142, 921 P.2d 1, the California Supreme Court explained the defenses of perfect and imperfect self-defense: "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable."

In this case there is no evidence in the record to support an imperfect self-defense instruction. All the evidence showed Gonzalez and his companions were the aggressors who approached Tweedie and shot him. There was no evidence presented that Gonzalez had any belief that he needed to defend himself, reasonable or unreasonable. Even if the evidence could be construed to show that Tweedie was trying to pull a gun out from behind his back, it would only show that he was attempting to defend himself.

Further, to the extent the court erred in failing to instruct on imperfect self-defense, there is no reasonable probability that the jury would have convicted Gonzalez of manslaughter instead of first degree murder. The evidence was overwhelming that there was no imminent threat to Gonzalez's safety. Rather, all the evidence from eyewitnesses, and statements by Gonzalez himself, points only to his intentionally shooting Tweedie as an act of retaliation. He approached Tweedie, called out his gang affiliation, and then shot Tweedie three times. Afterwards, he bragged about shooting him. Accordingly, any error in failing to instruct on imperfect self-defense was harmless.

Lodgment 6 at 20-21.

Petitioner is not entitled to federal habeas relief on this claim.  Generally, challenges to jury instructions based solely on alleged errors of state law do not state cognizable claims in federal habeas corpus proceedings.  Estelle v. McGuire, 502 U.S. 62, 71-72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (stating that "it is not the province of a federal habeas court to

21

reexamine state-court determinations on state-law questions."). Here, Petitioner's claim is cognizable because he alleges that the trial court's refusal to instruct the jury on imperfect self-defense violated his constitutional rights to due process and to present a defense. Pet. at 7. However, where the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy" and, in order to qualify for federal habeas relief, Petitioner must show that the lack of jury instruction "so infected the entire trial that the resulting conviction violated due process." Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973) and Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th Cir. 1992)); see also Estelle, 502 U.S. at 72. Moreover, the alleged error must be considered in the context of the instructions as a whole and the entire trial record (including the arguments of counsel). Oquendo v. Jacquez, 2011 WL 3205351 at *6 (C.D. Cal. May 9, 2011) (citing Estelle, 502 U.S. at 72). Therefore, even if the court's failure to provide this instruction was error, Petitioner still would not be entitled to habeas relief unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." Id. (citing Brecht v. Abrahamson, 507 U.S. 619, 637–38). Additionally, a state trial court's finding that the evidence does not support a claim of imperfect self-defense is entitled to a presumption of correctness on federal habeas review. Mendendez, 422 F.3d at 1029 (citing Hartman v. Summers, 120 F.3d 157, 161 (9th Cir. 1997)).

The record supports the California Court of Appeal's conclusion that the trial court did not err by omitting the imperfect self-defense instruction because the evidence did not support the position that Petitioner unreasonably believed that he needed to defend himself from the victim. Petitioner did not present any evidence that, at the time of the killing, he had an actual fear of an imminent danger to his life or of great bodily injury or that he felt the need to defend himself. The evidence presented at trial, including that Petitioner and four or five of his fellow gang members walked down the street and approached the victim, a member of a rival tagging crew, called out a gang sign, and then shot the victim three times, does not support an inference that Petitioner subjectively believed that he was in

imminent peril at the moment he fired his gun.  Lodgment 2 at 389-395 & 801-806; see also Menendez, 422 F.3d at 1030 (holding that imperfect self-defense instruction was not warranted where the evidence was insufficient to show that "at the moment he shotgunned his parents to death, he feared he was in imminent peril").  The evidence does not suggest that Petitioner was attempting to protect himself or leave when he fired his gun.

The only evidence potentially bearing on whether Petitioner believed he was in imminent peril at the time of the shooting was testimony that the victim raised a rifle as if to shoot it.  Lodgment 2 at 450-451.  However, in light of all of the other evidence, this information does not present a case for imperfect self-defense as Petitioner and his fellow gang members were the ones who sought out, approached and challenged the victim.  Id. at 390-392, 804-805.  As the appellate court reasoned, if the victim did pull out a rifle, likely he was trying to defend himself against the five or six gang members who had just approached him, not creating a scenario in which Petitioner had to shoot to protect himself.  Lodgment 6 at 21.  This evidence that Petitioner wrongly insists the court did not consider, is not sufficient to require the trial court to have issued a jury instruction on imperfect self-defense.  Even if the lower court erred, Petitioner has not shown a "substantial and injurious effect" from that error.  For the foregoing reasons, this Court **RECOMMENDS** that Petitioner's Petition be **DENIED** on ground two.

### C.      Prejudicial Gang Evidence

Petitioner's final claim is that his federal constitutional dues process right to a fair trial was violated when the trial court "admitted extensive amounts of extraneous, yet unduly prejudicial gang evidence." Pet. at 8.  Petitioner states that while "some of the evidence was relevant to the issue at trial, much of it was irrelevant, yet unduly prejudicial, and merely demonstrated for the jury a predisposition on [Petitioner's] part toward criminal activity." Id.  Petitioner argues that the testimony was particularly prejudicial given the fact that the prosecution did not charge him "with a criminal street gang allegation" and that the reason the prosecution provided to the trial court in support of their motion in limine to introduce

1    gang evidence was that without the evidence, "I can't tie defendant to the crime." Id. and

2    Traverse at 7.

3         Respond contends that Petitioner's claim fails to state a federal question and lacks

4    merit because the state court's determination of the matter was objectively reasonable.

5    Answer at 23.  Respondent notes that whether or not evidence is properly admitted is a

6    function of state evidence law and, therefore, not a basis for federal habeas relief. Id.

7         Before trial began, the state trial court considered arguments from counsel on both

8    sides regarding the introduction of expert testimony. Lodgment 2 at 79-134 & 137-152. The

9    court held multiple hearings on the admissibility of gang evidence and ultimately found that

10   there would probably be sufficient foundation for the gang testimony once other evidence

11   was introduced. Id.  In accordance with the court's ruling, District Attorney Investigator,

12   Joseph Winney, testified about his experience with gangs as a law enforcement officer, the

13   structure and habits of Southern California Latino Gangs, retaliation for perceived disrespect,

14   the evolution of tagging crews into gangs, emerging gangs, aspects of Varrio Clairemont and

15   its rivals, evidence that Petitioner was a Varrio Clairemont member, and a motive for the

16   victim's shooting: the throwing of a gang sign or shouting a gang slogan. Id. at 1326-1397.

17        Petitioner raised the issue of gang evidence in the petition for review he filed in the

18   California Supreme Court, which denied the petition without citation of authority. Lodgment

19   10. The Court will therefore look through the silent denial by the state supreme court to the

20   appellate court opinion. Ylst, 501 U.S. at 804.  The court of appeal found that:

21        Here, the court did not err in admitting Winney's gang testimony. It assisted
          the jury by explaining a motive for Gonzalez's shooting of Tweedie. It was
22        relevant to show that Ingram and his associates could be targeted for
          retribution for beating up a Varrio Clairemont member and also for merely
23        making a gang sign as members of Varrio Clairemont drove by. It explained
          the particular structure of the groups involved in the shooting and their rivalry.
24        It is "difficult to imagine a clearer need for expert explication than that
          presented by a subculture in which this type of mindless retaliation promotes
25        'respect.' " (People v. Olguin (1994) 31 Cal.App.4th 1355, 1384, 37 Cal.Rptr.2d
          596 .)
26
          Moreover, any prejudice that resulted from the introduction of this evidence
27        was far outweighed by its relevance. "The prejudice which exclusion of

28                                      24                    11cv960-DMS (BLM)

1   evidence under Evidence Code section 352 is designed to avoid is not the
2   prejudice or damage to a defense that naturally flows from relevant, highly
    probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or
3   damaging to the defendant's case. The stronger the evidence, the more it is
    "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies
4   to evidence which uniquely tends to evoke an emotional bias against the
    defendant as an individual and which has very little effect on the issues. In
5   applying section 352, "prejudicial" is not synonymous with "damaging.' "
    [Citation.]" ( People v. Karis (1988) 46 Cal.3d 612, 638, 250 Cal.Rptr. 659, 758
6   P.2d 1189.)

7   Finally, the court instructed the jury on the limited purpose for which the jury
    could consider the gang evidence:

8   "You may consider evidence of gang activity only for the limited purpose of
9   deciding whether the defendant had a motive to commit the crime charged,
    the defendant actually believed in the need to defend himself, the defendant
10  acted in the heat of passion, and the defendant was the person who
    committed the crime charged. You may also consider this evidence when you
11  evaluate the credibility or believability of a witness and when you consider the
    fact and evidence relied upon by an expert witness in reaching his or her
12  opinion. You may not consider this evidence for any other purpose. [¶] You
    may not conclude from the evidence that the defendant is a person of bad
13  character or that he has a disposition to commit crimes."

14  We presume the jury heeded this instruction. (People v. Delgado (1993) 5
    Cal.4th 312, 331, 19 Cal.Rptr.2d 529, 851 P.2d 811.

15  Lodgment 6 at 24-26.

16      Petitioner is not entitled to federal habeas relief due to the trial court's admission of

17  the gang evidence.  Generally speaking, federal habeas courts do not review questions of

18  state evidence law.  Estelle, 502 U.S. at 67–68.  Only when evidence renders the trial so

19  fundamentally unfair as to violate federal due process, is federal habeas relief available.

20  Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009).  However, "[A] habeas petitioner

21  bears a heavy burden in showing a due process violation based on an evidentiary decision."

22  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).  "Under AEDPA, even clearly

23  erroneous admissions of evidence that render a trial fundamentally unfair may not permit

24  the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,'

25  as laid out by the Supreme Court." Ojito v. Clark, 2011 WL 4626013, *7 (S.D.Cal., March

26  02, 2011) (quoting Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009)).  Since there

27  is no clearly established Federal law, as determined by the U.S. Supreme Court, on the issue

28                                      25                          11cv960-DMS (BLM)

1   of whether "admission of irrelevant or overtly prejudicial evidence constitutes a due process
2   violation," the court of appeal's decision could not have been contrary to or an unreasonable
3   application of clearly established federal law.  Id. (quoting Holley, 568 F.3d at 1101).
4   Furthermore, the admission of evidence will only rise to the level of a due process violation
5   if there are no permissible inferences that the jury may draw from the evidence.  Jammal
6   v. Van de Kamp, 926 F.2d at 918 (9th Cir. 1991).

7          Here, the gang evidence introduced by the prosecution assisted the jury in
8   determining whether or not Petitioner was affiliated with a criminal street gang and
9   understanding why Petitioner may have been motivated to shoot the victim, how disrespect
10  and retaliation play into gang relationships, and the credibility of various witnesses.  As such,
11  there were numerous permissible inferences that the jury could draw from this evidence.
12  Additionally, the scope of the evidence was limited and the jury was instructed as to how
13  they were allowed to consider the information.

14          Because the gang evidence could have led the jury to a permissible inference, the
15  admission of the evidence did not violate Petitioner's right to due process of law.  Jammal,
16  926 F.2d at 920.  Even if Petitioner is correct and the gang evidence was irrelevant and
17  unduly prejudicial, Petitioner has not established that the evidence rendered the trial
18  fundamentally unfair given the significant amount of evidence supporting the jury's verdict.
19  Finally, even if the evidence was improper and it rendered the trial fundamentally unfair,
20  "habeas relief still would not be warranted under the AEDPA because the Supreme Court 'has
21  not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence
22  constitutes a due process violation sufficient to warrant issuance of the writ'" and this Court
23  "cannot find a state court ruling to be unreasonable based on Ninth Circuit precedent."
24  Pacheco v. Busbe, 2011 WL 2437480, *8 (C.D. Cal. March 22, 2011) (citing Holley, 568 F.3d
25  at 1101 & Musladin, 549 U.S. at 77); see also Smith v. Tilton, 2012 WL 125106, *8 (March
26  29, 2012) (citing Holley, 568 F.3d at 1101).

27          For the foregoing reasons, this Court **RECOMMENDS** that Petitioner's Petition be

28

1   **DENIED** on ground three.

2   **CONCLUSION AND RECOMMENDATION**

3       For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge

4   issue an order: (1) approving and adopting this Report and Recommendation, and (2)

5   directing that Judgment be entered denying the Petition.

6       **IT IS ORDERED** that no later than **July 16, 2012**, any party to this action may file

7   written objections with the Court and serve a copy on all parties.  The document should be

8   captioned "Objections to Report and Recommendation."

9       **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

10  Court and served on all parties no later that **July 30, 2012**.  The parties are advised that

11  failure to file objections within the specified time may waive the right to raise those

12  objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir.

13  1998).

14      **IT IS SO ORDERED.**

15  DATED:  June 18, 2012

16

17                                          BARBARA L. MAJOR
                                           United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28                                  27                    11cv960-DMS (BLM)